Dale *v.* Dale.

THOMAS NELSON DALE, appellant,

*v.*

FREDERICK S. DALE, respondent.

1. Though fraud in procuring a will may be inferred, the inference cannot lawfully be drawn unless it is natural and necessary.   And the court will refuse to impute fraud when the evidence does not necessitate a belief in its existence.

2. In this case a mother gave all her property, with comparatively small exceptions, to one of her two sons.   It appeared that she was of sound mind, and that when she made the will she harbored resentment against the other son, arising out of a business transaction between him and her.   The son to whom she gave almost all her estate was on confidential terms with her, and acted as her amanuensis in giving instructions for the will, and aided her in obtaining the will from her lawyer, after it was drawn, to be executed.   There was no evidence of threats, restraint or coercion of any kind, nor even of importunity or persuasion, to induce her to make the will.—*Held,* that there was in the case no evidence of testamentary incapacity, nor any evidence of undue influence, and (reversing the decree of the orphans court) that the will must be admitted to probate.

On appeal from decree of Passaic orphans court refusing to admit to probate a paper writing, purporting to be the will of Sarah P. Dale, deceased.

*Mr. H. Wallis* and *Mr. John Linn,* for appellant.

*Mr. J. S. Barkalow* and *Mr. J. D. Bedle,* for respondent.

Dale *v.* Dale.

THE ORDINARY.

Sarah P. Dale, widow of Thomas N. Dale, deceased, died on the 8th of May, 1880, in Philadelphia, at the house of her friend, Rev. David Winters, whose family she was then visiting, and whose wife was an old acquaintance and intimate friend of hers. She had been at his house for over five weeks—from about the 26th or 27th of March preceding. On the 28th of April, ten days before her death, she executed her will, which had been some time previously drawn for her by her lawyer, Mr. Hamilton Wallis, and which was sent to her at Philadelphia. By the will, after ordering that her debts and funeral and testamentary expenses be paid, she gave to her son, Thomas Nelson Dale, as his absolute property, all her personal property, including paintings, books, furniture, bronzes, porcelain and glassware, diamonds, jewelry, silver and silver-plated ware in her possession, or to which she might be entitled at the time of her death, except such as was in the will specifically bequeathed, and also certain real estate in New Haven, and her house and lot at Newport, with the furniture therein. She then gave to his daughter, Sarah Nelson Dale, the contents of two barrels (of crockery) belonging to her, the testatrix, and in Paterson, to be delivered to her by the executors whenever her parents, or the survivor of them, shall certify, in writing, that she is of sufficient discretion to receive them, and provided that if both of the legatee's parents should die without making any such certificate, the contents of the barrels are to be delivered to the legatee on the death of the survivor of her parents. She then gave to her son, Thomas Nelson Dale, all her property, real and personal, that might come to her as heir-at-law or devisee of her father, then deceased, and which might come to her by devise or descent from her mother, and also all her interest in a bill of sale and chattel mortgage, given to her by her son, Frederick S. Dale, of certain machinery in Paterson, and all moneys that might become due or payable to her or her estate therefrom or thereunder, in trust, first, to apply the rents, profits and income to the payment of all taxes, insurance premiums, interest or repairs that might become chargeable against the property, or any

Dale *v.* Dale.

part of it, or that might be necessary for its preservation; second, to pay to the two daughters of her son Frederick $1,000 each, in such installments and at such times as the trustee, with the advice of her other executor (David L. Daggett, of New Haven) might think proper, the legacies to bear interest from the period of one year from her decease; to receive the rents and income from the property to come to the testatrix as heir or devisee of her father, and apply them to his own use until his youngest child living at her death, or that might be born within the ordinary time of gestation thereafter, should have reached the age of twenty-one years, and thereupon to divide that property equally among those children and the legal representatives of such of them as should have died, *per stirpes* and not *per capita;* to divide what property she might be entitled to as heir-at-law, next of kin or devisee of her mother, into two equal parts, and retain one for himself absolutely, and invest the other half as he should see fit and pay the net income to his wife, for life, and the principal, at her death, to their daughter Sarah, or her legal representatives; and she gave the residue of her estate to him and appointed him and Mr. Daggett, before mentioned, the executors, giving them power to sell her real estate.

The admission of the will to probate is resisted by the testatrix's son Frederick, and his opposition to it is based on the allegation that she was, when the will was made, not possessed of testamentary capacity, and that the will was the result of undue influence by his brother, Thomas Nelson, upon her. The testatrix had but the two children. Her husband died in the summer of 1879. Her estate amounts, according to the caveator's estimate, to about $44,000. When she died she had long been suffering from a disease which in her case proved incurable, and which at last caused her death. In the summer of 1879 she was in Europe, at Teplitz, in Bohemia, whither she had gone some time previously, and where she had stayed alone. Her husband, when she went to Europe, remained in Paterson, and her two children also remained in this country. In the summer of 1879 her son Frederick went to Teplitz to see her, with a view, as it appears, of purchasing from her certain machinery

for the manufacture of silk owned by her and being in Paterson, and which he was desirous of purchasing, but for which he had failed to make a bargain with his father (who acted as his wife's agent in the matter), they being unable to agree upon the price. She and Frederick returned together. After they had returned to Paterson she sold the machinery to Frederick (her husband died in June, 1879) for $20,000. After the negotiations were completed and the sale made, a misunderstanding arose between them, which was adjusted by her agreeing to accept the sum of $200, which he offered to give instead of a much larger sum which she claimed he owed her (he denied the justice of the claim, however), on account of interest or the use of the machinery, in the transaction. From that time she appears to have entertained feelings of resentment and hostility towards him on that account, and repeatedly refused to see him when he called at the house (Thomas's) where she was. Dr. Blondell, who was called by the caveators, and who was her physician while she was in Paterson, says that when the sale of the machinery was brought about, all her feelings towards Frederick seemed to be changed, and instead of affection, her feeling seemed to be one of hate. It appears from his testimony that he learned from her that there was a misunderstanding (it appears to have occurred as far back as the fall of 1879) between them arising out of that sale. Mr. Wallis, the testatrix's lawyer, who advised her in the matter of the sale, so far as she needed legal advice, and who prepared the papers which were executed in the transaction, testifies that she expressed herself (this was, he says, in the first part of November, 1879) as being very much dissatisfied with Frederick's refusal to pay what she demanded; that he, Mr. Wallis, told her he would not advise her to enter into any contest in relation to the matter; that a contest would only result in tying up the machinery so that it would produce her no income, and that all contests were uncertain as to their results, and that under the circumstances he would advise her to accept her son's proposition, which was in the nature of a compromise, to allow her two or three hundred dollars for the use of the machinery; that she said that if she must, she supposed she must, but that Frederick

would have cause to regret compelling her to accept any such proposition, or something to that effect. To Anna Inglis she said that she had made over her property to her son Nelson (Thomas); that Frederick must remember that what he took from her now he could not have when she was gone, and that she had given $2,000 to his children to prevent the breaking of the will. The witness just mentioned further says that the testatrix, at the time she told her of the will, said that Frederick had done her two or three ugly tricks, but she never believed he would have done this, and that it was on account of the difficulty which arose out of the sale of the machinery that she refused to see him. To Elizabeth Provan she complained of Frederick's treatment of her in the matter of the machinery, and said she could not trust him. In this connection, it may be remarked that one of the caveator's witnesses testifies that in August, 1879, after the testatrix returned from Europe, she said to him that she loved Frederick as much as she did Thomas; that she was glad the former was getting along as well as he was, and she praised him for what he had done for her when he was in Europe. This conversation, it must be remembered, took place before the difficulty in regard to the machinery occurred, and it is apparent that when, subsequently to that conversation, she changed her opinion of Frederick, it was because of what seemed to her to be an adequate reason. Of the adequacy of it, however, we cannot judge (and it is not important to do so) without a better knowledge of Frederick's dealings with her and the rest of the family than the evidence discloses. It does appear that Mr. Dale, the father, was unfriendly to Frederick up to his death; so much so that when the latter was about to go to Europe, in 1879, he went to the house where his father was then living, to take leave of him, and, though his father bade him good-bye, it was after turning his back to him, and he refused to shake hands with him. It appears that there was enmity between Frederick and Thomas. It is quite probable that the testatrix's dissatisfaction with Frederick was heightened and intensified by the fact that she considered that he had got a great bargain in buying the machinery from her at

$20,000, notwithstanding she was willing to sell it at that price, previously to the sale to him, and to let it go for about $19,000, the amount of her claim, at the sale at which she acquired her title to it, which was a sale under an execution in her favor for about that sum. After the sale of the machinery had been completed, which was February 16th, 1880, she made her will, and she appears to have set about making it soon after that date, although it was not signed until April following. She gave directions for it herself. She first went to Mr. Wallis's office on that business in February, and she then had a conversation with him on the subject. At his suggestion then made to her, she sent to him, at his office in the city of New York, a written memorandum dictated by her to her son Thomas, at his house in Paterson, and by him written down, and probably taken by him to Mr. Wallis's office. She subsequently visited Mr. Wallis again at his office on the subject, and he then went over the memorandum with her, making some alterations in it. On that occasion she and he conversed together on the business for about an hour. From the memorandum thus altered, and other papers which she furnished him, Mr. Wallis made a draft of the will, which he sent to her at Paterson, and received it back again after it had been altered a little, and a blank, which had been left for the name of one of the executors, filled with the name of Mr. Daggett. From the draft the will was engrossed. Mr. Wallis testifies as follows:

" Some time—it must have been in the month of February, 1880—Mrs. Dale called upon me in relation to her will; she wanted me to draw her will for her, and I told her if she would put her ideas in shape—in rough shape on paper—so that I could understand it, I would prepare the will and send it to her; I think it was on that occasion that she asked me if it was necessary to state in her will the names of all her children, and I told her that there was an antiquated notion that that was necessary, but that in fact it was not necessary; I then received this paper, which I produce; whether it was sent to me by mail or not I am not certain, but I incline to think that it was not; I have no recollection on the subject, but from the manner in which the paper has been folded, I am satisfied that it was brought to me and not sent by mail; Mrs. Dale called upon me afterwards; when I arrived at my office in the morning I found her in my private room, alone; my best recollection is that

Dale *v.* Dale.

at that time she produced this paper; that is, the same one; it may have been I had received it before; at all events, this paper was there present; I went over the paper with Mrs. Dale, and made certain changes in pencil, or annotations in pencil, which are on the paper now; we had a conversation there about an hour, and after the conversation was over I escorted her to the outer door, and met her son Nelson in the outer office; from this paper, and certain others, I prepared the draft of the will.

"The question arose during that conversation whether the property in New Haven, which passed under her father's will, and which she seemed to consider as hers, whether she really had a title to it, was tied up by the trust, so that the title would pass by operation of law to her heirs if she died before her mother; I requested her to obtain for me a copy of her father's will before I proceeded to draw her will, and she sent me one, which I have here, also copy of certain partition proceedings in New Haven, Connecticut, which I here produce from these documents, which I will now offer in evidence separately; from those papers or from the information contained in those papers I prepared a draft of the will; that was some time in the month of March—either the latter part of February or the early part of March, 1880; which draft I have in my hand; I prepared a pencil draft, and this is a copy made by a copyist in my office from that pencil draft; this I sent to Mrs. Dale, in Paterson, and received it back by mail, I think with two alterations or with three alterations—the one on the first page, the one on the third page and the insertion of the name of an executor, which had been left blank, on the last page; no, I find one other on the next to the last page. About the same time that I received that paper I received directions to send the will engrossed to Mrs. Dale, in Philadelphia, giving the street and number where she was to be addressed; about that time I moved my office from 120 Broadway, Equitable Building, to 48 Wall street, where I am now; we actually commenced to move; I am very positive, on the 24th of March, or about that time; it was just a week before the 1st of April, 1880; the will was engrossed, but the engrossed copy. which is the paper in evidence already—the paper put in evidence the first day—the will offered for probate—was packed away with other documents in the office for removal; I received a letter from Nelson Dale, which I cannot find, stating that his mother was anxious for her will, and wanting me to send it to her; I found the engrossed copy, but could not find the address of Mrs. Dale, in Philadelphia; I knew the address of her son in Newport, and I therefore sent the will to him for him to forward it to his mother; the next time I saw it was when it was produced by Frederick S. Dale and Nelson Dale, after their mother's death. In all these interviews I had with Mrs. Dale —and there were several of them—I failed to notice any sign of mental weakness or mental disturbance; she certainly appreciated fully her rights in regard to that machinery, and understood and told me what she wanted done with it; she also stated to me, generally, the other property she possessed; she also knew the names of her children, who they were, and impressed me as being a woman of very excellent and sound sense; I had no idea that anything was the matter with her, and did not until after her death; I think she stated to me, two or three times that she did not expect to live long; I never transacted

Dale *v.* Dale.

any business for Nelson Dale until I propounded this will for probate; never knew him until he was brought into my office by Mrs. Dale herself, so far as I can recollect."

That the testatrix was possessed of testamentary capacity, both at the time of the preparation of the will and at the time of executing it, there seems to be no reason to doubt. Her conversations with Mr. Wallis, Miss Inglis and Mrs. Provan clearly show that she had full capacity when the will was prepared. Reference has already been made to the conversations with Mr. Wallis and Miss Inglis. About three weeks before she went to Philadelphia, that is, in the early part of March, she had a conversation with Mrs. Provan on the subject of the will, in which she told Mrs. Provan what disposition she was going to make thereby. Mrs. Provan asked her whether she thought that that disposition of her property was a just one, and she replied that she supposed she would receive condemnation from some persons on account of it, but that Frederick was a smart business man and had an opportunity of making a living, which Thomas had not, and that what she was doing was for the best— providing for those who could not provide for themselves. The testimony of the subscribing witnesses shows that she was competent when the will was signed. Those witnesses were Rev. Mr. Winters, Mr. William J. Kelly, a bookseller of Philadelphia, and Dr. William B. Atkinson, of that city. He was her physician there. They all regarded her as entirely competent, and they all had opportunity to judge of her testamentary capacity. Mr. Winters had known her for a long time. At her request he invited Mr. Kelly and Dr. Atkinson to come to his house on that day for the purpose, as they were told when they were invited, of witnessing her will. He invited them to dinner and they came accordingly. After dinner the will was produced in the front parlor and was signed there. Dr. Atkinson says he and the testatrix were talking about everything, chatting for a long while about the current topics of the day, and even joked about the contesting of wills. The medical testimony adduced to show that her condition from the effects of disease must have been such as to incapacitate her for the disposition of her prop-

Dale *v*. Dale.

erty by will, is met by counter-testimony of the same kind and of at least equal weight. And here it may be remarked that her business capacity was not doubted or questioned by the caveator down to February 16th, 1880, at least, for he then closed with her the transaction of the sale of the machinery by which he bought from her property at the price of $20,000. Indeed, her competency to do business does not appear to have been questioned by anybody at any time. The proof of her actual mental condition at the time of the act under scrutiny, the making of the will, is, to say the least of it, far more satisfactory and convincing than the conjectural opinions of the experts. And this is especially so seeing that one of the testamentary witnesses was himself an expert, her physician, and (as were the others also) wholly without interest of any kind in the disposition of her estate. "The point of time," said Vroom, ordinary, in *Sloan* v. *Maxwell, 2 Gr. Ch. 563, 573,* "at which the testator's competency is to be tested, is that of the execution of the will; his antecedent or subsequent condition is chiefly important as it may bear on that epoch. And we naturally resort, in the first place, to the subscribing witnesses, because they have seen him at the decisive period, and because the law expects from them peculiar care, caution and circumspection, presuming from the fact of the attestation that they believed him competent, as otherwise they ought not to have given countenance to a deceptive instrument." Much stress is laid, on the part of the caveator, on the fact that the testatrix, while she was in Paterson in March, 1880, lay for about two days in a comatose condition, the effect of her disease, from which it is argued, that taking into account the nature of her complaint and the stage of it in which she then was, it follows, legitimately and necessarily, that she was incompetent when she executed the will. But the attack was but transient, though of long duration. She recovered from it and went, in the latter part of the month, to Philadelphia, where she remained till her death. Dr. Atkinson says she told him of that sickness, and that she had been for quite a considerable time unconscious. He was asked:

" Did she, on that occasion [an occasion on which he was called to visit her professionally], tell you that she had, before coming to Philadelphia at that time, been for several hours, and on one occasion as long as eighteen hours, unconscious from the effect of it ? "

And he answered :

" She told me something to that effect ; I can't say eighteen hours, but it was quite a considerable time she was unconscious."

So that she not only knew of the sickness but was fully aware of its character.    Much reliance is placed by the caveator on the testimony of Elizabeth O'Conner (who was a servant in Thomas's family), as showing mental disturbance and serious aberration in the testatrix.    But the testimony is entitled to but very little, if any, weight, and it may be said, as to all the testimony now under consideration, that the mental incapacity, the existence of which it is produced to establish, was but temporary and did not exist when the will was made.    It is worthy of remark that the coma occurred in March, while the instructions for the will were given in February, and the will was executed on the 28th of April.    The letters of the testatrix, written while she was in Philadelphia, are by no means evidence of the want of testamentary capacity, but the contrary.    Her whole conduct in reference to the will while she was at Mr. Winters's house, not only shows competency, but freedom from constraint of any kind.    In January, 1876, she made a will in which she made gifts of valuable goods, jewels and ornaments to Mrs. Winters, besides two legacies amounting to $5,000.    That will she delivered to Mr. Winters for safe keeping.    At her request, he sent her a copy of it while she was in Europe.    The will now under litigation gives nothing to Mrs. Winters or her family, though testatrix gave her some articles of household furniture during her last visit.    Notwithstanding the change in her will, so far as Mrs. Winters was concerned, she did not, though she was a guest at her house, conceal the fact that she had made the new will or what its contents were.    Mr. Winters testifies that soon after (he thinks it was the next day) she came to his house on her last

Dale v. Dale.

visit, she told him she had made her will and expected soon to sign it. He also says that at her request he read the will over to her two weeks before it was executed, and that he read it to her several times. After it was executed it went into her possession. Neither of her sons was in Philadelphia during that visit before the will was signed. Thomas, who came first, arrived there only about five days before she died. After she reached Philadelphia she seems, as appears by the correspondence put in by the caveator, to have been anxious to get the will, that she might execute it, and after she got it she wanted to be sure that it was as she intended it to be.

It is urged that the conduct of Thomas in connection with the making of the will is evidence of fraud on his part. It appears that he acted as his mother's amanuensis in making the memorandum for the will, and assisted her in correcting the draft which was sent to her by Mr. Wallis, but it does not appear that he did anything more in those matters than to comply with her wishes. There is no evidence that her will was overborne by his, or that he had recourse even to persuasion to induce her to favor him in her testamentary disposition of her estate. It is urged that the fact that the will reached her hands through his is a circumstance significant of undue influence; but it appears that the understanding was (as Mr. Wallis testifies), not that it should be sent to Thomas or to her through him, but that it should be sent directly to her address in Philadelphia. Mr. Wallis ·appears to have delayed sending it merely because he lost sight of it for a while in moving the furniture and papers of his office, and it was only because he had forgotten her address and lost the memorandum of it, if he had any, that he sent it (and he did it of his own accord, and merely because he did not know how else to get it to her), to Thomas, at Newport, to be forwarded to his mother, and it was forwarded accordingly. There is no evidence of threats, restraint or coercion of any kind to produce the will; nor, as before stated, even of any importunity or persuasion. It has been repeatedly said that undue influence, like other species of fraud, must be proved, and will not be presumed. It is a conclusion and not a presumption, and the burden of proof, where

the testator was of sound mind, is on the person who impeaches the will on the ground of fraud. "In order," said the lord chancellor in *Boyse* v. *Rossborouyh, 6 H. of L. 2, 51,* "to set aside the will of a person of sound mind, it is not sufficient to show that the circumstances attending its execution are consistent with the hypothesis of its having been obtained by undue influence. It must be shown that they are inconsistent with a contrary hypothesis." To the same effect was the charge of Judge Grier in *Turner* v. *Hand (Meeker Will Case), 3 Wall. Jr. 88, 113;* "Circumstances which should avail for the proof of fraud are such only as are inconsistent with a contrary view of the transaction, and lead, irresistibly, to that conclusion." And though fraud may be inferred, the inference cannot lawfully be drawn unless it is natural and necessary. The caveator insists that it appears that Frederick was prohibited by Thomas from seeing his mother while she was at the latter's house at the visit during which the will was prepared; but not only do Thomas and his wife swear that this was done at her request, but the evidence of Miss Inglis corroborates their statement. She testifies that the testatrix told her that she had refused to see Frederick once or twice; that the reason of it was the difficulty about the machinery, and that Frederick had called at the house to see her and that she sent word that she could not see him, but afterwards did see him. She also says that the testatrix told her she had received him coldly. The circumstances and incidents which are relied upon as the evidence of the incapacity or fraud imputed, do not seem to me to possess such weight or force as to justify the conclusion that the testatrix was incompetent, or that the will was the result of fraud.

It is not the province of the court to make wills for testators nor to defeat their testamentary intentions, where there is capacity and no fraud; and in simple justice to the accused, no less than out of regard to the rights of testators and the dictates of a sound public policy, it will refuse to impute fraud where the evidence does not necessitate a belief in its existence. It is obviously not for the court to annul a testator's disposition of his property by will on the mere ground that he has unequally or unjustly divided his estate, or even capriciously or through prejudice

Dale *v.* Dale.

given it away from those who, in view of his natural or social relations and obligations, have undoubted claims upon his bounty or his justice, and bestowed it upon less worthy, or even upon absolutely unworthy objects.

In the language of Chief-Justice Green, in *Den* v. *Gibbons,* *2 Zab. 117,* the validity of a will cannot depend upon the consistency of its provisions with our ideas of fairness or propriety, or even with the principles of justice and humanity; such a test of its validity would be certainly subversive of that absolute control and dominion which the law has given to every man over his own property. In his charge in *Greenwood* v. *Geenwood,* reported in *3 Curt. Appx. 337,* Lord Kenyon, referring to the testator's prejudices against his brother, said that if those prejudices, though on improper grounds, were such as might reside in a sound mind, while it was hard that they should lead to conclusions unfavorable to his brother, yet, hard as the case might be, it was better that a thousand hard cases should take place than that the court should remove the landmarks by which man's property is to be decided. And he proceeded further to say that the testator's conduct to his brother was to be considered to ascertain whether it was the evidence of a derangement of mind or only of an unreasonable prejudice; and if it were the latter, it did not unfit him to make the will. He added, "A multitude of instances there have been where men have taken up prejudices against their nearest and dearest relations—it is the history of every week in the year, and the history of almost every family, at one time or other, that harsh dispositions have been made, that unreasonable prejudices have taken place, that one child standing equally near in blood has been preferred to another; and if once we get into digressions of that kind, then we get upon a sea without a rudder. Where will you stop? What partiality will be enough to set aside a will, and what partiality will you give way to and say the will is good? These are questions which the most correct and acute mind that ever addressed himself to the consideration of questions will not be able to settle." And here it will not be out of place to advert to the case of *Wintermute* v. *Wilson, 1 Stew. Eq. 437,* decided in

the court of errors and appeals in 1877. The testator was advanced in years and enfeebled by disease, but his mental decay had not reached the point of legal disqualification. The will was plainly unjust to his wife. Besides her claim upon him, arising from her faithful discharge of her duty to him as a wife, she had for many years successfully managed his affairs, and there was reason to believe that a large part of the property which the will diverted from her was the fruit of her own exertions. Said Chief-Justice Beasley in delivering the unanimous opinion of the court, " But the misfortune is that such diversion was not without cause. Just before the making of this will she quarreled with her husband, and the anger thus kindled was not suffered to die out, but was inflamed by some of those who were likely to profit by it. But the occasion of the anger being real, there is no pretext for saying that the will is the offspring of delusion ; in truth, it is the product of bad advice and a disproportioned resentment; and this clearly can lay no ground for setting it aside in a court of law. The will was properly admitted to probate." It is the duty of courts not only to uphold but to guard the right of free testamentary disposition of property. Public policy demands it. " The English law," said Lord Chief-Justice Cockburn, in *Banks* v. *Goodfellow, L. R.* (*5 Q. B.*) *549, 564,* " leaves everything to the unfettered discretion of the testator, on the assumption that though, in some instances, caprice or passion, or the power of new ties or artful contrivance or sinister influence, may lead to the neglect of claims that ought to be attended to, yet the instincts, affections and common sentiments of mankind may be safely trusted to secure, on the whole, a better disposition of the property of the dead, and one more accurately adjusted to the requirements of each particular case, than could be obtained through a disposition prescribed by the stereotyped and inflexible rules of a general law."

In the case in hand the estate is almost entirely given to one of the two children, to the disinherison of the other. A testator of sound mind is at liberty to make an absolutely unfair disposition of his property, and, in the absence of fraud, his will must

Dale *v.* Dale.

stand. That the testatrix had a reason (one or more) for her action in making the disposition is clear, though, if of sound mind, she was at liberty to act even capriciously in. the matter, and might have disinherited both sons had she seen fit, and have given her whole estate to strangers or to charity. It is proved, as before shown, that after the sale of the machinery to Frederick, her feelings towards him, in consequence of what she regarded as his unfair dealing with her in that matter, changed from love to dislike, and she harbored resentment against him. There was no delusion as to the transaction. She did sell him machinery for the price of $20,000, and there was a difference between them in which she, on the one hand, demanded a very considerable sum of money from him as interest, or for the use of the machinery, which he, on the other, refused to pay, denying the justice of her demand, but subsequently offered $200, which she unwillingly accepted. This appears from the caveator's own testimony. There was, then, no delusion, but a real ground for her action. This is apart from the fact that she appears to have had still another reason, viz., that Frederick was a man of business, and therefore able to take care of himself without aid from her, while Thomas was not, but was merely a man of science. In fine, the testatrix was possessed of testamentary capacity. She understood the business in which she was engaged when she made her will. She knew what her property was and who were the objects of her bounty, and the manner in which she disposed of her property. There is no proof of fraud. The will was executed with all due legal formalities. It must be admitted to probate. It will be so decreed. The decree appealed from will therefore be reversed. Under the circumstances, the costs of both sides, with reasonable counsel fees in both courts, should be paid out of the estate.